**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 10787** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **JUNG JOO PARK, CHARLES C. PARK,** | ) | |
| **JAMES PARK, NINA PARK, and** | ) | |
| **JOHN DOE, as representative of the estate** | ) | |
| **of Que Te Park,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, the United States of America, brings this action against surviving family members of Que Te Park to collect a financial penalty assessed against him for failing to report his foreign bank accounts. His children, defendants Charles C. Park, James Park, and Nina Park, have moved to dismiss the claims against them. Additionally, James Park has moved to quash service of process on behalf of his mother, Jung Joo Park. For the following reasons, the motions are denied.

## BACKGROUND

The following facts are taken from the government's Third Amended Complaint and are assumed true at this early stage of the proceedings. Que Te Park ("Mr. Park") was a businessman who lived in Inverness, Illinois. Through his business entities, QT, Inc., and Q-Ray Company, Mr. Park sold "Q-Ray" bracelets. A Q-Ray bracelet was an ionized piece of jewelry that purported to relieve pain and arthritis by affecting the wearer's "chi." Mr. Park's businesses sold Q-Ray bracelets via television infomercials, websites, and trade shows, generating net sales figures of approximately $87 million.

Mr. Park's wife, Jung Joo Park ("Mrs. Park") served as Secretary of QT, Inc. and Q-Ray Company. Their son Charles was an officer, shareholder, and director of QT, Inc., as well as a shareholder of Ion Ray Co., Ltd., a corporation that distributed Q-Ray bracelets. The Parks' son James was a full-time employee of QT, Inc., and served as a director, and he was also a shareholder of Ion Ray Co., Ltd. The Parks' daughter Nina was a shareholder of Ion Ray Co., Ltd., and Ion Ray, Inc., another corporation that marketed and sold Q-Ray bracelets.

In May 2003, the Federal Trade Commission ("FTC") filed suit against Mr. Park, his business entities, and Mrs. Park for false and misleading advertising of the Q-Ray bracelets. *See* Compl., *FTC v. Que Te Park et al.*, Case No. 03 C 3578 (N.D. Ill. May 27, 2003), ECF No. 1. Following a bench trial, the court entered final judgment against Mr. Park and the business entities, granting relief that included disgorging approximately $16 million. *See FTC v. QT, Inc.*, 512 F.3d 858, 860 (7th Cir. 2008). Mr. Park allegedly returned to consumers only $11.8 million of the $16 million due to them, and the FTC moved for the appointment of a receiver to conduct an accounting, prevent dissipation of assets, recover fraudulently transferred assets, and repatriate foreign assets to satisfy the FTC's judgment.

Mr. Park filed for Chapter 7 bankruptcy protection in February 2007, just two days after the FTC filed its motion for appointment of a receiver. On May 3, 2007, the bankruptcy court approved the trustee's appointment of an examiner to investigate Mr. Park's affairs and determine whether he had concealed assets. The bankruptcy court ordered Mr. Park to surrender his property and sit for an examination, but sometime in late 2007 or early 2008, Mr. Park fled the country. The trustee filed an adversary proceeding to contest the discharge of Mr. Park's debts, alleging that he had concealed assets to defraud creditors.

On June 30, 2008, the United States Department of Justice sought an order from a federal court in Miami to authorize the Internal Revenue Service ("IRS") to use a John Doe summons to request information from Swiss bank UBS AG about United States taxpayers who may be using Swiss bank accounts to evade federal income taxes. Following service of the summons on July 21, 2008, the government received banking information for accounts of which Mr. and Mrs. Park were beneficial owners. Their tax returns did not reflect their interest in these Swiss bank accounts. The government alleges that Swiss banks' compliance with its attempts to obtain information from them was receiving publicity in 2008 and thereafter, which drove taxpayers such as Mr. Park to disclose foreign bank accounts they had not previously disclosed.

On June 10, 2010, Mr. Park filed amended tax forms for the years 2007 and 2008. Mr. Park had timely filed a 2007 Report of Foreign Bank Accounts ("FBAR") form, but he had only disclosed three foreign bank accounts on that form, and his 2007 Form 1040 reported interest income of only $9,900 from an HSBC bank account in China. In 2010, his amended form 1040X for 2007 showed additional income from foreign bank accounts totaling nearly $240,000. For 2008, Mr. Park had not timely filed any FBAR form, but in 2010, he filed a delinquent 2008 FBAR form, which disclosed not three but ten foreign bank accounts—the UBS account, four other Swiss bank accounts, two Chinese accounts, and three Korean accounts—containing more than $7 million.

Between 2008 and his death in 2012, Mr. Park made numerous transfers to Nina. From June 7, 2010, to May 4, 2012, he transferred $43,017 to Nina through her Chase bank account. In June 2008, through Mrs. Park, he provided Nina and Mrs. Park $280,000 to purchase a condominium at 2101 West Rice Street in Chicago, titled in the name of Nina and Mrs. Park. In

2009, Mrs. Park transferred her interest in the condo to Nina, making her the sole title holder, and Nina has earned rental income from the condo ever since.

In 2011, the IRS initiated an audit of Mr. Park's tax accounts. During the audit, the government learned that Mr. Park died in July 2012. Under the terms of a will executed and notarized in Illinois, his assets were to be placed into a revocable trust, which became irrevocable upon Mr. Park's death. The beneficiaries were the four defendants in this case. Mrs. Park was the Successor Trustee to Mr. Park; if she was unable to act as trustee, then Charles, James, and Nina ("the Park children") were Successor Co-Trustees.

Mr. Park owned substantial property in South Korea. After Mr. Park's death, despite the existence of the Illinois will and without probating it, Mrs. Park and Charles arranged with South Korean probate attorneys between November 2012 and January 2013 to oversee a sale of the South Korean property and a distribution of the proceeds of over $3.6 million to the Park children and Mrs. Park. Each of the Park children received $400,000 from the sale of the South Korean property. Mrs. Park received $2,300,000.

On November 21, 2014, the IRS assessed a penalty against Mr. Park of $3,509,429.50, fifty percent of the value of his foreign bank accounts, for his willful failure to file a timely FBAR form for 2008. The penalty remains unpaid.

The government's complaint consists of six counts: Count I, against Charles and Mrs. Park, as representatives of Mr. Park's estate, to reduce the 2008 FBAR civil penalty to judgment; Count II, against Mrs. Park, for fiduciary liability under 31 U.S.C. § 3713; Count III, for fiduciary liability of Charles Park under 31 U.S.C. § 3713; Count IV, to set aside fraudulent transfers under 28 U.S.C. § 3304; Count V, to set aside fraudulent transfers under the Illinois Fraudulent Conveyances Act; and Count VI, for federal common law restitution/unjust enrichment.

4

Mrs. Park now resides in South Korea, and the government has not served her there. The government attempted to serve her at James's home in Georgia. James moves to quash service. The Park children move to dismiss the complaint.

## ANALYSIS

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (ellipsis omitted)).

Under federal notice-pleading standards, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Additionally, any claims of or including acts of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires the pleading party to "state with particularity the circumstances constituting fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 775 (7th Cir. 2016). Although fraudulent or deceptive intent "may be alleged generally," Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by providing the "who, what, where, when and how" of the alleged fraudulent conduct. *See Bank of Am., Nat'l Ass'n, v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

Federal Rule of Civil Procedure 12(b)(5) authorizes a party to file a motion challenging the sufficiency of service of process. "Where there has been insufficient process, the Court does not have personal jurisdiction over a defendant." *Pike v. Decatur Mem'l Hosp.*, No. 1:04-CV-0391, 2005 WL 2100251, at *1 (S.D. Ind. Aug. 26, 2005) (noting that "motions pursuant to Rule 12(b)(5) and Rule 12(b)(2) (a motion to dismiss for lack of personal jurisdiction) are interrelated"). In considering a 12(b)(5) motion, the court may receive evidence outside the pleadings, *Chatman v. Condell Med. Ctr.*, No. 99 C 5603, 2002 WL 737051, at *2 (N.D. Ill. Apr. 22, 2002), but "the facts are viewed in the light most favorable to the nonmoving party." *Paget v. Principal Fin. Grp.*, No. 1:12-CV-01575-TWP-MJ, 2013 WL 4413324, at *1 (S.D. Ind. Aug. 14, 2013) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997)). "Service generally will be quashed and the action preserved [rather than dismissed] in those cases in which there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly." *Chatman,* 2002 WL 737051, at *2; *see also Hill v. Sands,* 403 F. Supp. 1368, 1370 (N.D. Ill. 1975) ("[I]f service of process is insufficient but a reasonable prospect exists that the plaintiff could properly serve the defendant, the court quashes service but retains the case.").

6

I.     **APPLICABILITY OF SOUTH KOREAN LAW**

Initially, the Park Children argue, relying on *Berliant v. Commissioner*, 729 F.2d 496, 499-500 (7th Cir. 1984), that the law of South Korea, which the government has not invoked, governs any transferee liability of Charles and his siblings for their father's FBAR penalty.  It is unclear why this matters to the Park children; they do not describe any conflict between South Korean and Illinois or federal law that explains their preference.  But whatever their reasons, their argument is unpersuasive because they have not cited pertinent legal authority to support it.

*Berliant* concerned transferee liability under 26 U.S.C. § 6901, a statute not implicated here.  In *Commissioner v. Stern*, 357 U.S. 39, 42-43 (1958), on which the Seventh Circuit relied in *Berliant*, the United States Supreme Court held that a predecessor version of § 6901 "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes"—specifically, § 6901 provides that the government may collect taxes from a taxpayer's transferee by the same "summary administrative" procedures it uses to collect from taxpayers themselves.  Because the statute is "purely . . . procedural," and because federal courts have long applied state law when the government seeks to collect from a taxpayer's transferee without Congress "manifest[ing] a desire for uniformity of liability," the Court held that "until Congress speaks to the contrary, the existence and extent of liability should be determined by state law."  *Id.* at 44-45.  The portion of *Berliant* that the Park children cite is nothing more than a straightforward application of this holding.  *See* 729 F.2d at 499 ("In order for [appellants] to be liable as transferees . . . there must be a basis under state law or . . . equity . . . for imposing transferee liability.  [*Stern*, 357 U.S. at 39.]  Section 6901(a) merely establishes a procedure for tax collection but does not establish transferee liability.  Since [the decedent's] probate estate was

administered under Illinois law, that law governs whether [the appellants] are liable, legally or equitably, for the estate's unpaid taxes.").

The proposition that a particular tax collection statute is "purely . . . procedural," *Stern*, 357 U.S. at 44, or "merely establishes a procedure," *Berliant*, 729 F.2d at 499, has no application in a case in which the government has not followed that procedure, has not cited or relied on that statute, and is not seeking to collect a tax. In this case the government has not sought to collect taxes, estate or otherwise, by way of its "summary administrative" process under § 6901; to the contrary, it has sought to collect an unpaid FBAR penalty by filing this civil action, in which it asserts numerous independent causes of action. The Park children have not explained why § 6901 or *Berliant* applies here.

By no means did *Berliant* hold that, in any case in which the government seeks to collect proceeds of the administration of an estate under any legal theory, the law of the situs of the estate governs any transfers from the estate to the decedent's children for all purposes. While certain of the Park children's property rights might well be governed by South Korean law, *Berliant* does not compel that conclusion, nor have the Park children otherwise demonstrated it. Certainly, neither *Berliant* nor any other authority the Park children have cited suggests that the Court must dismiss this case based on South Korean law; so far as defendants have shown, South Korean law could be in perfect harmony with other potentially applicable law in all relevant respects. The Court rejects, at least for now, defendants' argument that South Korean law governs transferee liability in this case.

## II. FBAR PENALTY

The government claims that Mrs. Park and Charles are liable for the FBAR penalty assessed against Mr. Park as representatives of his estate. Charles argues that the government fails

to state an FBAR claim because (a) the government has not pleaded sufficient factual detail about the penalty and the assessment, (b) the penalty is invalid because it exceeds the maximum set by applicable regulations, and (c) the government did not timely assert the claim during Mr. Park's lifetime and it does not survive his death.

### A. Plausibility of Government's FBAR Claim

In order to state a claim to reduce to judgment a civil FBAR penalty imposed under 31 U.S.C. § 5314, 31 U.S.C. § 5321, and 31 C.F.R. § 1010.350, the government must plead facts to support reasonable inferences that (1) the government assessed a civil penalty, and (2) the penalty was valid because (a) Mr. Park was a U.S. "person" who (b) had an interest in or authority over foreign accounts, which (c) had an aggregate value of $10,000 or more, and (d) he willfully failed to file an FBAR form to report the accounts to the government. *United States v. Pomerantz*, No. C16-0689, 2017 WL 2483213, at *5 (W.D. Wash. June 8, 2017).

According to Charles, the government's allegations do not meet the *Twombly/Iqbal* plausibility standard because it does not allege factual details such as when Mr. Park filed certain tax forms and what information they contained. Without more facts, Charles argues, it is not plausible that any deficiency in his foreign bank account reporting was willful. Further, Charles argues that the government does not allege in sufficient detail the terms and circumstances of the assessment.

With respect to the FBAR claim, the government alleges the following core facts:

- A judge of this district entered a judgment of some $16 million against Mr. Park and his businesses, which they did not fully satisfy;
- In the midst of subsequent bankruptcy proceedings, Mr. Park fled the country;
- Mr. Park timely filed a 2007 FBAR form, disclosing three accounts, but did not timely file a 2008 FBAR form by June 30, 2009;
- Following reports that Swiss banks were cooperating with the United States government by revealing information about foreign accounts held by United States residents (and after UBS revealed such information about Mr. Park's accounts), tax

advisors began to counsel taxpayers to file amended tax forms disclosing such accounts for prior years;

- On June 10, 2010, Mr. Park filed a delinquent 2008 FBAR form[1] disclosing ten foreign bank accounts, some of which he had not previously disclosed, which held more than $7 million; and

- The IRS assessed an FBAR penalty for 2008 on November 21, 2014.

The Court is unable to find any deficiency in these allegations. First, Charles argues that the allegations of the assessment are insufficient because the government does no more than baldly state that a penalty was assessed on a particular date in 2014, without describing or attaching any documentation of the assessment. But to require such detailed pleading would all but require the government to plead evidence, which exceeds the *Twombly*/*Iqbal* standard. *See Lippert v. Godinez*, No. 13 C 1434, 2014 WL 540415, at *2 (N.D. Ill. Feb. 11, 2014) (citing *Iqbal*, 556 U.S. at 678) ("[Plaintiff] need not prove his claim in his complaint; he need only allege sufficient facts to state a claim that is plausible on its face."). The government need only allege sufficient facts to make plausible the conclusion that the government assessed a valid penalty, and it does so by making detailed allegations of the underlying conduct for which the penalty was assessed. The government need not, for example, attach documentation of the assessment to its complaint; that sort of evidence need only be introduced at later stages of the case. *See Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) (stating that "[a] complaint under Rule 8 limns the claim; details of both fact and law come later, in other documents"). To the extent

---

[1] Charles argues in the Park children's motion to dismiss that "the allegations of the Third Amended Complaint give the impression that Que Te may have filed more than one 2008 FBAR." (Mot. to Dismiss 3d Am. Compl. at 7, ECF No. 74.) The Court finds no such ambiguity in the complaint. Even if the complaint is ambiguous, the Court is bound to resolve the ambiguity by construing the allegations so as to permit reasonable inferences in favor of the plaintiff, so long as the allegations give rise to a reasonable expectation that discovery will yield evidence supporting them. *See Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1103 (7th Cir. 2015) (citing *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)). So construing the allegations, the complaint describes a single 2008 FBAR form, untimely filed in 2010, with sufficient clarity to give fair notice of the government's claim, which is all it is required to do at this early stage.

Charles argues that the government's allegations are insufficient because it does not specifically describe or attach particular documents, he is incorrect.

Charles argues that the allegations are not sufficient to support a reasonable inference that Mr. Park acted willfully, based on *United States v. Pomerantz*, No. C16-689, 2017 WL 2483213, at *3 (W.D. Wash. Jun. 8, 2017). *See also Bedrosian v. United States*, 912 F.3d 144, 152-53 (3d Cir. 2018) (defining "willfulness," in the context of a claim for an FBAR penalty, as knowing or reckless conduct). But the government points out that the *Pomerantz* court later held in a subsequent decision that the government's amended complaint contained sufficient allegations of a willful FBAR violation because the penalized party had properly filed FBAR forms in prior years, so he clearly knew of the requirement and how to satisfy it:

> In its amended complaint, the Government alleges that Mr. Pomerantz filed timely FBAR Forms, reporting his interest in the CIBC accounts for the years 2001-2002, and again in 2005. This allegation is sufficient to demonstrate that Mr. Pomerantz understood the reporting requirements regarding the CIBC accounts long before 2007, the first year that the Government alleges Mr. Pomerantz willfully failed to report his income in these accounts. The Government's other allegations—that Mr. Pomerantz signed tax returns in the years 2007 through 2009, and reported income from the CIBC accounts when that income was less significant, but failed to report higher maximum account balances—support the inference that Mr. Pomerantz acted with knowledge that his conduct was unlawful. The Government's amended complaint therefore pleads sufficient factual content to allow the Court to draw the reasonable inference that the defendant willfully failed to file FBAR Forms for the CIBC Accounts.

*United States v. Pomerantz*, No. C16-689, 2017 WL 4418572, at *3 (W.D. Wash. Oct. 5, 2017) (internal citations omitted). This case is similar. Mr. Park filed a timely FBAR form for the year 2007, but he only disclosed three foreign accounts on it, and on his original, timely-filed 2007 tax return, he reported interest income of less than $10,000 from a HSBC account in China. In 2008, he did not file a timely FBAR form, and in his timely-filed tax return he reported a similar amount of income from the Chinese HSBC account. In the amended tax forms he filed in 2010, he reported

*ten* foreign bank accounts in 2008, as well as 2008 interest income several times what he had initially reported.  A reasonable factfinder could conclude from these facts, as in the second *Pomerantz* decision, that Mr. Park knew of the FBAR filing requirement (after all, he filed an FBAR form in 2007) and willfully failed to file one in 2008 to prevent the government from learning of foreign assets and income.  Also supporting the inference are the facts that plaintiff was experiencing financial difficulties due to the judgment against him, which caused him to declare bankruptcy and flee the country.  These facts might signal to a reasonable factfinder that plaintiff did not file an FBAR form in 2008 because he was trying to preserve as much of his assets and income as he could, rather than exhaust them by paying debts to the government.

Charles's arguments are without merit because he overstates the government's pleading burden and because, based on the allegations the government has made, a reasonable factfinder could conclude that he willfully failed to file a FBAR form.

### B.  Validity of Government's FBAR Claim

Charles argues that the FBAR penalty the government allegedly assessed against Mr. Park was invalid because it exceeded the legal limit for such penalties.

The applicable legal and regulatory structure is as follows:

In 1970, Congress enacted the Currency and Foreign Transactions Reporting Act, commonly referred to as the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311-5314, 5316-5332, in order to combat money laundering in the United States . . . . Congress authorized the Department of Treasury (the "Treasury") to implement the BSA. *See* 31 U.S.C. § 5311.

Pursuant to the BSA, United States "persons" are required to file an FBAR indicating their financial interests in and/or signatory authority over a foreign account if certain conditions are met. *See* 31 U.S.C. § 5314(a); 31 C.F.R. § 1010.350(a). Specifically, such persons must file an FBAR by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *See* 31 C.F.R. § 1010.306(c).

Congress authorized the Secretary of the Treasury (the "Secretary") to assess penalties against those who fail to satisfy the FBAR filing requirement. *See* [31 U.S.C. §] 5321; 31 U.S.C. § 5322. The Secretary delegated authority to . . . the Director of the Financial Crimes Enforcement Network . . . to impose civil penalties, [and he, in turn,] delegated [his] FBAR duties to the IRS. . . . Thus, the IRS is responsible for . . . "[a]sessing and collecting civil penalties [for FBAR violations.]" IRS FBAR Reference Guide, https://www.irs.gov/pub/irs-utl/IRS_FBAR_Reference_Guide.pdf.

. . . For willful violations, the IRS may impose a criminal penalty and/or a civil penalty. *See* § 5321; 31 U.S.C. § 5322. The civil penalty for a willful violation may not exceed the greater of $100,000, or 50% of the amount in the unreported account. See § 5321(a)(5)(C).

The IRS must assess a civil penalty within six years of the violation. *See* § 5321(b)(1). To collect the assessment [in a case in which the taxpayer faced no criminal action arising out of the same transaction], the Government must commence a civil action within two years of . . . ["]the date the penalty was assessed[.]" *See* § 5321(b)(2).

*United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1357-58 (M.D. Fla. 2018) (internal citations altered).

Charles argues that, while § 5321(a)(5)(C) provides that the maximum FBAR penalty is $100,000 or 50% of the amount in the unreported account, the penalty is further limited by 31 C.F.R. § 1010.820(g), which provides that the maximum penalty for a willful violation is not to exceed $100,000, total:

(g) For any willful violation committed after October 27, 1986, of any requirement of § 1010.350, . . . the Secretary may assess upon any person, a civil penalty:
. . .
(2) In the case of a violation of § 1010.350 . . . involving a failure to report the existence of an account or any identifying information required to be provided with respect to such account, a civil penalty not to exceed the greater of the amount (***not to exceed $100,000***) equal to the balance in the account at the time of the violation, or $25,000.

31 C.F.R. § 1010.820 (emphasis added). Two district courts have so held, reasoning that the BSA gives the Secretary of the Treasury the discretion to determine what penalties to impose for violations of the statute, and the government is bound by regulations promulgated by the

13

Department of Treasury such as 31 C.F.R. § 1010.820, so long as they are not inconsistent with the BSA. *See United States v. Wahdan*, 325 F. Supp. 3d 1136, 1139-40 (D. Colo. 2018), *United States v. Colliot*, No. AU-16-CA-01281-SS, 2018 WL 2271381, at *2-3 (W.D. Tex. May 16, 2018).

Several district court and United States Court of Federal Claims decisions have rejected the reasoning of *Wahdan* and *Colliot*. *See United States v. Garrity*, No. 3:15-CV-243, 2019 WL 1004584, at *1-5 (D. Conn. Feb. 28, 2019); *United States v. Horowitz*, 361 F. Supp. 3d 511, 514-15 (D. Md. 2019); *Kimble v. United States*, 141 Fed. Cl. 373, 388-89 (2018); *Norman v. United States*, 138 Fed. Cl. 189, 195-96 (2018). In *Garrity*, the most recent such decision and the most exhaustively reasoned, the court explained that the Secretary promulgated the penalty portion of § 1010.820 in 1987, and the regulation simply restated, nearly verbatim, what at that time was the language of the penalty section of the statute. *Garrity*, 2019 WL 1004584 at *2. In 2004, Congress amended 31 U.S.C. § 5321(a)(5) to state that the maximum penalty for an FBAR violation, if found to be willful, "shall be increased to the greater of—(I) $100,000, or (II) 50 percent of the amount" in the unreported account. The Secretary did not promulgate updated regulations to reflect the new penalty.

The court in *Garrity* reasoned that "where Congress intended in the BSA to rely on the Secretary first to flesh out the statutory scheme by regulation, it made that intention clear," as it had in § 5314, which directed the Secretary to "require citizens to . . . 'keep records . . . and file reports'" containing certain information 'in the way and to the extent the Secretary prescribes.'" 2019 WL 1004584, at *3 (quoting 31 U.S.C. § 5314(a)). But Congress had betrayed no such intention in § 5321(a)(5). *Garrity*, 2019 WL 1004584, at *3. While Congress did not establish specific reporting requirements in the BSA, leaving that to the Secretary, it *did* establish, in § 5321,

14

specific parameters for civil penalties, providing what the maximum penalty for willful violations "shall" be. According to the court in *Garrity*, it does not follow from the fact that the Secretary has discretion to establish the reporting requirements that give rise to an FBAR violation that the Secretary also has discretion to "override Congress's clear directive" with respect to what the applicable penalties "shall" be, once the Secretary "chooses to impose them for a reporting violation." *Id.*; *see also Norman*, 138 Fed. Cl. at 196 (reasoning that Congress's use of the "imperative, 'shall,' rather than the permissive, 'may,' . . . removed the Treasury Secretary's discretion to regulate any other maximum"); *id.* at 195-96 (reasoning that Congress stated its intention to amend the BSA in 2004 to "'increase[e] the penalty for willful behavior'" in order to "'improve the reporting of foreign financial accounts'") (quoting S. Rep. No. 108-192 at 108 (2003) and Joint Committee on Taxation, *General Explanation of Tax Legislation Enacted in the 108th Congress*, JCS-5-05 at 387 (2005)).

The *Garrity* decision also rejected the argument that, even assuming that Congress left the Secretary any discretion with respect to the maximum penalty for a willful FBAR violation, the Secretary intentionally limited his own discretion by leaving § 1010.820's $100,000 maximum in place. The court explained that § 1010.820, when it was initially promulgated in 1987, had only parroted the language of the statute so that the Treasury department could enforce the BSA "'to the fullest extent possible.'" *Garrity*, 2019 WL 1004584, at *3 (quoting *Amendments to Implementing Regulations Under the Bank Secrecy Act*, 52 Fed. Reg. 11436, 11440 (Apr. 8, 1987)). Further, unlike other portions of the regulation, the portion that was related to the penalty for willful FBAR violations by a "person" (as opposed to a financial institution) was *not* promulgated after notice and comment. *See* 52 Fed. Reg. at 11436 ("On August 25, 1986, Treasury published in the Federal Register (51 FR 30233) a series of proposed changes to the Bank Secrecy

15

Act regulations."); *Amendments to Implementing Regulations; the Bank Secrecy Act*, 51 Fed. Reg. 30233 (Aug. 25, 1986) (making no mention of penalties for willful violations of BSA by persons). Because the penalty portion of the rule never went through the notice-and-comment process, it was "at most, an interpretive rule; it 'd[id] not have the force and effect of law.'" *Garrity*, 2019 WL 1004584, at *3 (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015)). Thus, courts need not place any weight on the fact that the Secretary has left § 1010.820 in place.

This Court finds the reasoning of *Garrity* and *Norman* persuasive. Congress specifically and intentionally raised the maximum penalty for FBAR violations, and no regulation promulgated by the Secretary can reduce it again. Administrative regulations exist to implement statutes, not alter them. *See Norman*, 138 Fed. Cl. at 196 (citing *United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("For regulations, in order to be valid, must be consistent with the statute under which they are promulgated.")); *see also Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936) ("The power . . . to prescribe rules and regulations . . . is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity."). The penalty provision of 31 C.F.R. § 1010.820 does not state the maximum applicable penalty under 31 U.S.C. § 5321(a)(5); the maximum penalty is in the text of the statute, and, regardless of whether the Secretary has discretion to define FBAR reporting requirements, once a violation has occurred, the statute's maximum penalty provision applies.

At most, as the *Garrity* court explained, § 1010.820 is an "interpretive rule" that is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *Perez*, 135 S. Ct. at 1204 (internal quotation marks omitted)—but it no longer

16

appears to serve even that limited purpose. Not only does the text of the statute tell a different story, so does the IRS. The government's position in this lawsuit is apparently guided by the Internal Revenue Manual ("IRM") § 4.26.16.6.5(3), which, as the court explained in *Horwitz*, "now provides that '[f]or violations occurring after October 22, 2004, the statutory ceiling is the greater of $ 100,000 or 50% of the balance in the account at the time of the violation.'" 361 F. Supp. 3d at 515. The IRM does not have the force of law, but it "has been used, on a limited basis, to provide guidance in interpreting terms in regulations." *Id.* at 515 (internal quotation marks omitted). The Court finds its guidance persuasive in this case, for the reasons set forth above.

Charles tacks on an argument that the assessment of the penalty violated due process and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* This is an affirmative defense inappropriate for resolution on a motion to dismiss. *See* Fed. R. Civ. P. 8(c)(1) (listing examples of affirmative defenses, including "illegality"); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F. 3d 687, 690 (7th Cir. 2012) ("[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses."); *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("[A] complaint need not anticipate and overcome affirmative defenses."). Charles cites only decisions issued at the summary judgment stage, which provide no support for his position at this, earlier stage.

The IRS's assessed penalty of 50% of the value of Mr. Park's foreign accounts conforms to the requirements of law. Charles has not shown that the assessed penalty was illegal, so the Court denies the motion to dismiss Count I on that basis.

### C. Timeliness of Government's FBAR Claim and Applicability to Charles as Mr. Park's Estate Representative

Charles argues that no FBAR liability arose until the IRS assessed a penalty against Mr. Park on November 21, 2014, more than two years after his death. If the claim arose after Mr.

Park's death in July 2012 and after the distribution of his Korean "estate" between November 2012 and January 2013, the argument goes, then there is no claim, as Mr. Park could not have paid the FBAR penalty after his death, and neither Charles nor any other representative of Mr. Park's estate could pay a penalty before it existed.

The government responds that, as an initial matter, its claim for FBAR liability accrued not on the date of the assessment but on June 30, 2009, the date Mr. Park's 2008 FBAR form was due. *See* 31 C.F.R. § 1010.306(c). As the Tenth Circuit explained, in a separate but analogous context:

> A tax debt is created by the Tax Code, not the assessment process. *See United States v. Drachenberg*, 623 F.3d 122, 125 (2d Cir. 2010) ("A tax deficiency arises by operation of law on the date a tax return is due but not filed; no formal demand or assessment is required."). The IRS "'assessment' refers to little more than the calculation or recording of a tax liability." *United States v. Galletti*, 541 U.S. 114, 122 (2004).

*In re Mallo*, 774 F.3d 1313, 1326 (10th Cir. 2014); *see United States v. Ellet*, 527 F.3d 38, 40 (2d Cir. 2008) ("Tax liability . . . comes into being as of April 15. A tax deficiency notice . . . does not create that liability.") (internal quotation marks omitted); Rev. Rul. 79-310, 1979-2 C.B. 404 (1979) (citing *United States v. Moore*, 423 U.S. 77, 78 (1975)) ("Even though the decedent's liability had not been assessed at the time of death, the liability was established and constituted a debt due the United States."); *see also Bedrosian*, 912 F.3d at 150-51 (explaining that, although the FBAR statute is not in the Tax Code, it "was intended to promote, among other things, the collection of federal taxes" and it is "part of the IRS's machinery for the collection of federal taxes"). Not only did Mr. Park's FBAR liability arise before his death, the government argues, it also survives his death, and the FBAR penalty can be collected against his heirs. *See Schoenfeld*, 344 F. Supp. 3d at 1369-1376 (claim for FBAR penalty survives penalized party's death, enforceable against his son); *Garrity*, 2019 WL 1004584, at *1 (FBAR claim proceeded to trial and final judgment although the IRS assessed the FBAR penalty against the penalized party five

years after he had died); *see also* Compl., *Garrity*, Case No. 15 C 243 (D. Conn. Feb. 20, 2015) (ECF No. 1) (describing circumstances of penalized party's death and posthumous assessment).

The Court agrees with the government's position. The estate of a taxpayer who fraudulently concealed a portion of his income during his lifetime, but died before he personally filed a fraudulent return, cannot thereby "avoid a liability the taxpayer himself could not have avoided if his conduct had been uncovered while he was alive." *See Kahr v. Comm'r*, 414 F.2d 621, 626 (2d Cir. 1969). By the same logic, the estate of a person who willfully fails to file an FBAR form during his lifetime cannot avoid the penalty that the person could not have avoided if he had lived. *Schoenfeld*, 344 F. Supp. 3d at 1375-76 (citing, *inter alia*, *Kahr*). In *Schoenfeld*, the court reasoned that "remedial," rather than punitive, claims typically survive a party's death, 344 F. Supp. 3d at 1369-70, and courts have frequently held that actions to recover tax penalties are remedial, not punitive, *id.* at 1371, in part because the purpose of such penalties, among other purposes, is to reimburse the government for the heavy cost of investigating violations of its tax laws, *id.* at 1372-73. The court concluded that FBAR claims survive the penalized party's death for the same reasons, and this Court finds that reasoning persuasive. The government's claim based on Mr. Park's failure to file a 2008 FBAR form survives his death and is enforceable against his estate.

Charles argues that the *Schoenfeld* decision stands for the opposite proposition—that an FBAR claim *cannot* be enforced against an estate—but he misreads the decision. The Court stated that the estate *itself* was not a proper party to that action, but the government could proceed against the defendant's son as a distributee of the estate or against some recognizable representative such as "an appointed executor or administrator of the deceased party's estate." *Id.* at 1368-69 (citing, *inter alia*, *Valle v. Singer*, No. 11 C 700, 2011 WL 13186681, at *8 (M.D. Fla. Dec. 7, 2011) (citing cases in several jurisdictions)). That is precisely what the government has done in this case:

it has sued the penalized party's son as a distributee and as one of the people who, along with Mrs.

Park, acted as a representative of the estate by overseeing its liquidation and the distribution of its

proceeds.

Defendants' motion to dismiss is denied as to Count I.

## III.   FIDUCIARY LIABILITY OF CHARLES PARK UNDER 31 U.S.C. § 3713

Section 3713 provides as follows:

> **(a)(1)** A claim of the United States Government shall be paid first when--
>     **(A)** a person indebted to the Government is insolvent and--
>         **(i)** the debtor without enough property to pay all debts makes a voluntary
>         assignment of property;
>         **(ii)** property of the debtor, if absent, is attached; or
>         **(iii)** an act of bankruptcy is committed; or
>     **(B)** the estate of a deceased debtor, in the custody of the executor or
>     administrator, is not enough to pay all debts of the debtor.
>     **(2)** This subsection does not apply to a case under title 11.
> **(b)** *A representative of a person or an estate (except a [bankruptcy] trustee)*
> *paying any part of a debt of the person or estate before paying a claim of the*
> *Government is liable to the extent of the payment for unpaid claims of the*
> *Government*.

31 U.S.C. § 3713 (emphasis added).  To prove that a representative of an estate made a payment

in violation of § 3713(b), the government must show that (1) the person was a fiduciary of the

estate who (2) distributed the estate's assets before paying a claim of the government and (3)

*knew or should have known of the government's claim*.  *United States v. Marshall*, 798 F.3d

296, 312 (5th Cir. 2015) (emphasis added).  The third element is not apparent in the text of the

statute, but courts have "read into the provision the additional requirement[] that the

representative have 'knowledge of the debt owed by the estate to the United States or notice of

facts that would lead a reasonably prudent person to inquire as to [its] existence.'" *United States*

*v. Renda*, 709 F.3d 472, 480 (5th Cir. 2013) (citing *United States v. Coppola*, 85 F.3d 1015, 1020

(2d Cir. 1996)).

Charles seeks dismissal of Count III, for fiduciary liability against him under 31 U.S.C. § 3713, arguing that the government fails to state a claim because it fails to plead sufficient facts to support a reasonable inference that Charles knew or should have known of the government's claim against his father. According to Charles, the complaint's allegations that Charles was aware of his father's FTC lawsuit and bankruptcy and that he had fled the country for South Korea are insufficient to support a reasonable inference that he also knew or should have known of the FBAR penalty.

Charles's argument is not convincing. The government alleges not only that Charles knew of the FTC lawsuit, the bankruptcy, and his father's flight to South Korea, but also that he knew of efforts Mr. Park had made to put assets such as the family home beyond the reach of creditors and that he held assets in foreign bank accounts and other valuable foreign property. (3d Am. Compl. ¶¶ 56-57, 91-92, 94-95.) Based on these allegations as well as others (*see id.* ¶¶ 25, 36-40, 56-62), it is plausible that Charles's familiarity with Mr. Park's business and personal affairs might have put him on notice of facts that would lead a reasonably prudent person to inquire as to a potential tax debt or FBAR penalty arising out of the years following the FTC judgment and prior to the filing of the amended tax forms for those years in 2010. As the Court has already noted, the government need not prove its claim in the complaint; it need only state a plausible claim supported by enough factual detail to create a "reasonable expectation that discovery will yield evidence supporting the allegations." *See Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1103 (7th Cir. 2015) (citing *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)). The government has done so here.[2] Charles's motion to dismiss Count III is denied.

---

[2] The Court notes that, while the parties focus on Charles's knowledge of the FBAR penalty or of facts that would lead him to inquire about it, he may also have had knowledge of an unpaid portion of the FTC judgment, which would presumably also trigger § 3713 as a "claim of the Government." *See* 31 U.S.C. § 3701(b)(1) (defining "claim" for purposes of § 3713 as "any amount of funds or property that has been

## IV.  FRAUDULENT TRANSFER UNDER 28 U.S.C. § 3304

The Fair Debt Collection Practices Act provides that, in certain circumstances, transfers by someone who owes a debt to the United States are fraudulent as to that debt.  As relevant here, the statute provides as follows:

> **(b) Transfers without regard to date of judgment.--(1)** Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation--
>> **(A)** with actual intent to hinder, delay, or defraud a creditor.

28 U.S.C. § 3304(b)(1)(A); *see United States v. Schippers*, 982 F. Supp. 2d 948, 964-65 (S.D. Iowa 2013); *United States v. Kirtland*, No. 11-4090-JTM, 2012 WL 4463447, at *12 (D. Kan. Sept. 27, 2012).  The government may "obtain . . . avoidance of the transfer . . . to the extent necessary to satisfy the debt" or "a remedy . . . against the asset transferred or other property of the transferee." 28 U.S.C. § 3306(a). For transfers governed by § 3304(b)(1)(A), the government must bring the action "within 6 years after the transfer was made or the obligation was incurred or, if later, within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant."  28 U.S.C. § 3306(b)(1).  Nina argues that the government's § 3304(b)(1)(A) [3] claim against her is time-barred because most of the money Nina received from her parents, as described in the government's complaint, changed hands between 2008 and 2010, more than six years before this case was filed on November 21, 2016.

---

determined by an appropriate office of the Federal Government to be owed to the United States"); *Renda*, 709 F.3d at 481-82 ("'[C]laim' has been interpreted expansively.") (citing cases). But even assuming that Charles had to have notice of facts related to the FBAR penalty, the government's allegations are sufficient, as the Court has explained.

[3] The complaint does not specify any particular subsection of § 3304, but judging by their briefs, the parties appear to agree that § 3306(b)(1) provides the applicable statute of limitations, and it follows that they agree that § 3304(b)(1)(A) governs the underlying claim.

The government responds that the two-year discovery rule of § 3306(b)(1) applies because it did not discover and could not have discovered the transfers Nina received from her parents until this Court permitted it to take limited discovery in November 2017.

Nina replies that, while the attorneys litigating this case for the government may not have known about the transfers until November 2017, surely the plaintiff in this case, the United States, could have learned of most of them much sooner, particularly given that Nina must have reported the income she earned from the condo to the government.

Nina may well prove to be right in the end, but the Court cannot so conclude at the pleading stage. The government was not required to anticipate this affirmative defense in drafting its complaint, and a district court should not dismiss a claim as time-barred at the pleading stage unless the plaintiff has "admitted all the ingredients of an impenetrable [statute of limitations] defense." *Bader v. Air Line Pilots Ass'n*, 113 F. Supp. 3d 990, 998 (N.D. Ill. 2015) (internal alterations and quotation marks omitted); *see Skinner v. Midland Funding, LLC*, No. 16 C 4522, 2017 WL 1134490, at *2 (N.D. Ill. Mar. 27, 2017); *Kesse v. Ford Motor Co.*, No. 14 C 6265, 2015 WL 920960, at *5 (N.D. Ill. Mar. 2, 2015). The government has not admitted facts that show beyond all doubt that it could have discovered the allegedly fraudulent transfers to Nina more than two years before filing this suit. It is unclear what the government knew when, or when it could reasonably have discovered it; such details as what Nina and her parents reported to the government about her income, for example, are not in the complaint or any other documents properly before the Court at this early stage. The motion to dismiss is denied as to Count IV.

## V.   FRAUDULENT TRANSFER UNDER ILLINOIS UNIFORM FRAUDULENT TRANSFER ACT, 740 ILCS 160

In Count V, the government seeks, alternatively, to set aside the transfers to Nina under the Illinois Fraudulent Transfer Act, 740 ILCS 160/5.  Nina argues that the government does not meet its pleading burden because it is not clear whether the transfers were fraudulent in law or fact.

The government responds that it has alleged that the transfers were made with the actual intent to frustrate creditors and that, at the time of the transfers, Mr. Park was insolvent, but did not receive reasonably equivalent value in exchange for the transfers, which allegations are sufficient to state a claim under either theory.

Nina replies that the government's claim cannot survive when it admits that there is glaring ambiguity within Count V, but she is incorrect.  The government need not specify a legal theory in its complaint; it need only plead sufficient facts to state a claim.  *See United States ex rel. Sloan v. Waukegan Steel, LLC*, No. 15 C 458, 2018 WL 1087642, at *4 (N.D. Ill. Feb. 28, 2018)*; Escarzaga v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, No. 15 C 2568, 2015 WL 6445606, at *4 (N.D. Ill. Oct. 23, 2015).  Further, under Federal Rule of Civil Procedure 8(d), the government can plead claims in the alternative.  *See Estate of Stepney v. UMG Recordings, Inc.*, No. 10-CV-8266, 2011 WL 2119130, at *3 (N.D. Ill. May 26, 2011).  Nina seems to suggest in reply that, if the government intended to plead alternative legal theories, it should have pleaded the claim in separate counts, but nothing required the government to plead its claim in that fashion, and indeed, pleading separate legal theories in separate counts sometimes creates more confusion than clarity. *See Wright v. Carter*, No. 14 C 9109, 2015 WL 4978688, at *7 (N.D. Ill. Aug. 20, 2015).  Nina has not identified any pleading defect in Count V, and the motion is denied as to the Illinois fraudulent transfer claim.

24

## VI.   FEDERAL COMMON LAW UNJUST ENRICHMENT

In Count VI, the government asserts a claim of unjust enrichment under federal common law against each of the Park children, seeking to recover the $400,000 payments distributed to them following the sale of Mr. Park's South Korean property in 2012 and 2013.  The Park children argue that a federal common law claim is only cognizable where necessary to fill gaps and interstices in a statutory scheme, and the complaint does not identify the gap that the government's unjust enrichment claim fills, nor does it purport to plead unjust enrichment in the alternative. The government responds that the Park children ignore that courts also apply federal common law when it is necessary to protect uniquely federal interests, and, according to the government, the Court should do so here.

The Supreme Court set forth the relevant governing principles as follows:

> There is, of course, "no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Nevertheless, the [United States Supreme] Court has recognized the need and authority in some limited areas to formulate what has come to be known as "federal common law." *See United States v. Standard Oil Co.*, 332 U.S. 301, 308 (1947). These instances are "few and restricted," *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963), and fall into essentially two categories: [*1*] those in which a federal rule of decision is "necessary to protect uniquely federal interests," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964), and [*2*] those in which Congress has given the courts the power to develop substantive law, *Wheeldin* at 652.

*Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (internal citations altered). Particularly in cases in the second category, as the Park children argue, courts have considered whether "the judicial creation of a right is 'necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in the large by Congress.'"  *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. Illinois Range, Inc.*, 71 F. Supp. 2d 864, 868-69 (N.D. Ill. 1999) (declining to recognize restitution cause of action based on failure to pay withdrawal liability under ERISA because plaintiff could obtain same relief under specific statutory provisions of ERISA, without

25

resorting to federal common law) (quoting *Plucinski v. I.A.M. Nat. Pension Fund*, 875 F.2d 1052, 1056 (3d Cir. 1989)); *cf. UIU Severance Pay Tr. Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 513 (7th Cir. 1993) (recognizing employer's federal common law restitution claim to recover pension contributions paid by mistake because ERISA's provisions "[do] not establish a cause of action by which employers may seek to compel such a refund") (emphasis omitted). According to the Park children, this case is more like *Sheet Metal Workers' Fund* than *UIU Severance Pay Fund* because the government has claimed relief directly under the BSA, so if the government is entitled to relief at all, the statutory scheme itself provides it.

Even if this is the right framework for analyzing the issue, the Park children have not demonstrated that any unjust enrichment cause of action would merely duplicate the government's statutory causes of action, and, without fuller briefing, the Court is unwilling to so hold at this early stage of the litigation. Further, the Park children argue that, if the government intends to plead unjust enrichment in the alternative to other counts, it has not done so clearly enough, but the Court disagrees. It is common to plead unjust enrichment claim in the alternative to other claims, and it requires no magic formula; the plaintiff need only provide adequate notice by stating a plausible claim. *See, e.g., Smith-Brown v. Ulta Beauty, Inc.*, No. 18 C 610, 2019 WL 932022, at *10 (N.D. Ill. Feb. 26, 2019). The government has done so here.

Further, although the two categories the Supreme Court described in *Texas Industries*, 451 U.S. at 640, are "somewhat distinct analytically," they are not "mutually exclusive," and some cases fall into both categories. *See* 19 Wright & Miller, Federal Practice & Procedure § 4514 (3d Ed.). Among the "narrow areas" of law falling into the first category are "those concerned with the rights and obligations of the United States." *Texas Indus.*, 451 U.S. at 640-41 (citing *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366-67 (1943) (holding that federal law applied when

26

United States sued to recover value of a check issued by the United States and cashed on the basis of a forged endorsement because "the rights acquired by [the United States] as a result of the issuance [of the check] find their roots in . . . the Constitution and the statutes of the United States")); *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726-27 (1979) (applying federal law to determine the priority of liens stemming from federal lending programs because "federal law governs questions involving the rights of the United States arising under nationwide federal programs") (citing *Clearfield*).

In cases in which the government is a party and seeks to enforce its own pecuniary rights and interests, particularly when the government's "activities 'arise from and bear heavily upon a federal program,'" courts have held that uniquely "federal interests are sufficiently implicated to warrant the protection of federal law," *Kimbell Foods*, 440 U.S. at 726-27 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592-93 (1973)) (internal alterations omitted); *see also United States v. Marder*, 208 F. Supp. 3d 1296, 1318 (S.D. Fla. 2016) (citing *Clearfield* and *Kimbell Foods*) (applying federal law to unjust enrichment and other common law claims asserted alongside Medicare-fraud False Claims Act claims because "these . . . claims involve rights of the United States under a nationwide federal program"); *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *21 (N.D. Ill. Oct. 2 2006) (citing *Clearfield* and *Kimbell*) ("Because the assertion of these common-law claims [including unjust enrichment, asserted alongside a Medicare and Medicaid-fraud False Claims Act claim] involves rights of the United States under a nationwide federal program, federal common law governs these claims.").

The Court recognizes that the Supreme Court took a different tack in *Stern*, where it specifically rejected the government's argument that it should follow *Clearfield* and hold that

federal common law governs transferee liability under a predecessor version of 26 U.S.C. § 6901, reasoning as follows:

> Since [under the *Erie* doctrine] the federal courts no longer formulate a body of federal decisional law for the larger field of creditors' rights in diversity cases, any such effort for the small field of actions by the Government as a creditor would be necessarily episodic. That effort is plainly not justified when there exists a flexible body of pertinent state law continuously being adapted to changing circumstances affecting all creditors.

*Stern*, 357 U.S. at 45.[4]  But, as the Court has already explained in Part I of this Memorandum Opinion and Order, *Stern* applies only if § 6901 applies, *see also In re Pitts*, 515 B.R. 317, 328 (C.D. Cal. 2014) ("*Stern* simply stands for the proposition that federal collection-procedure statutes cannot create substantive liability where state law does not otherwise create any."), and this is not a case in which the government has proceeded under § 6901 to collect taxes.

In this case, the government has asserted independent causes of action in an Article III court to enforce its rights under a regulatory scheme requiring U.S. residents to report foreign bank accounts, not only to "promote . . . the collection of federal taxes," *Bedrosian*, 912 F.3d at 150, but also to "combat money laundering" and other illegal activities, *Schoenfeld*, 344 F. Supp. 3d at 1357-58 ("The BSA requires businesses to keep records and file reports that are determined to have a high degree of usefulness in criminal, tax, and regulatory matters [and] are heavily used by law enforcement agencies . . . to identify, detect, and deter money laundering, whether it is in furtherance of a criminal enterprise, terrorism, tax evasion or other unlawful activity.").  The government's rights pursuant to that nationwide program sufficiently implicate federal interests to warrant the protection of federal law, under *Clearfield*, *Kimbell Foods*, and like cases.

---

[4] The three dissenting justices would have applied federal common law, reasoning that Congress's "nationwide scheme of taxation" required federal courts to fashion uniform federal rules.  *Stern*, 357 U.S. at 48-49 (Black, J., dissenting).

Having determined that the government may assert an unjust enrichment claim under federal common law, the Court must determine whether its allegations are sufficient to state a claim. To state a federal unjust enrichment claim, the government must demonstrate that "'(1) [it] had a reasonable expectation of payment, (2) [defendants] should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'" *Harris Tr. & Sav. Bank v. Provident Life & Acc. Ins. Co.*, 57 F.3d 608, 615 (7th Cir. 1995) (quoting *Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 993–94 (4th Cir. 1990)). It is at least plausible, assuming the truth of the allegations of the complaint and drawing reasonable inferences in the government's favor, that (1) the government had a reasonable expectation that, upon Mr. Park's death, the proceeds of his estate would be used to pay his debts to the government, and (2) Mr. Park's children should have reasonably expected the same, rather than to receive the proceeds of the sale of his South Korean property. The government has stated a claim for unjust enrichment against the Park children under federal common law.

The government adds in a footnote in its response brief that even if it does not state an unjust enrichment claim under federal common law, it states an unjust enrichment claim under Illinois law; but the Park children argue otherwise because Count VI makes no reference to Illinois law anywhere. As the Court has already explained, the government need not plead a legal theory in its complaint, so long as it pleads the facts to support one. *See Escarzaga*, 2015 WL 6445606, at *4. Additionally, the Court notes that even when applying federal common law, courts may "giv[e] content to [the] federal rule" by "adopt[ing] state law," rather than fashioning a new rule out of whole cloth. *Kimbell Foods*, 440 U.S. at 727-28; *see also United States v. Vitek Supply Corp.*, 151 F.3d 580, 586 (7th Cir. 1998) ("Any effort to collect a debt due to the United States presents a claim under federal law, although state law may supply the substance of that federal

law."). From that point of view, the government's citation to Illinois law was not necessarily out of place.

The government has adequately pleaded its federal common law unjust enrichment claim, so the Park children's motion to dismiss Count VI is denied.

## VII.    MOTION TO QUASH SERVICE

On March 4, 2019, the government attempted to serve process on Mrs. Park at James's home in Georgia. James has moved to quash service, arguing that his mother resides in South Korea, not with him in Georgia, so service on her at James's home was improper.

James may well be correct, but he has no standing to raise the issue. Numerous courts have held that "[c]o-defendants do not have standing to assert improper service claims on behalf of other defendants," regardless of the alignment of their interests. *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 114-15 (S.D.N.Y. 2010); *see In re Grana y Montero S.A.A. Sec. Litig.*, No. CV171105, 2019 WL 259778, at *3 (E.D.N.Y. Jan. 9, 2019), *report and recommendation adopted*, No. 17CV1105, 2019 WL 1046627 (E.D.N.Y. Mar. 5, 2019); *Aqua-Chem, Inc. v. Bariven, S.A.*, No. 3:16-CV-553, 2017 WL 10379636, at *4 (E.D. Tenn. Aug. 17, 2017); *United States v. Stewart Mech. Enterprises, Inc.*, No. 3:10CV-712-S, 2012 WL 2312051, at *2 (W.D. Ky. June 18, 2012); *Sayles v. Pac. Engineers & Constructors, Ltd.*, No. 08-CV-676S, 2009 WL 791332, at *5 (W.D.N.Y. Mar. 23, 2009); *see also Lawson v. Qingdao Taifa Grp. Co.*, No. 1:10-CV-753-JMS-DKL, 2013 WL 5303741, at *2-3 (S.D. Ind. Sept. 19, 2013) (garnishee defendant had no standing to assert that court had no personal jurisdiction over judgment defendant based on defective service); *Burnett v. Country Mut. Ins. Co.*, No. 12-CV-0019, 2013 WL 12234282, at *6 (W.D. Wis. May 3, 2013) ("[A] party may object to personal jurisdiction or improper service of process only on behalf of himself or herself, since the objection may be

waived.") (internal quotation marks and alterations omitted) (applying Wisconsin law, but, finding no case on point, citing case law in numerous jurisdictions); *In re Shelton Fed. Grp., LLC*, No. 15-00623, 2018 WL 4468331, at *2 (Bankr. D.D.C. Aug. 21, 2018) (defendant in adversary proceeding had neither constitutional standing nor prudential standing to contest service on debtor); *Durham v. JP Morgan Chase Bank, N.A.*, 87 N.E.3d 1157 (unpublished table decision), 2017 WL 3222942, at *2-3 (Ind. Ct. App. 2017) (Barnes, J., dissenting) ("I conclude that, in general, a defendant cannot challenge the lack of proper service on a co-defendant unless the complaining defendant's rights would be prejudiced."); *People v. Matthews*, 76 N.E.3d 1233, 1238-39 (Ill. 2016) ("[B]ecause objections to personal jurisdiction and improper service may be waived, a party may object to personal jurisdiction and improper service of process only on behalf of himself or herself.") (internal quotation marks omitted).

This court agrees with these decisions. Nothing hinders Mrs. Park from contesting improper service in her own right, *see Shelton Fed. Grp.*, 2018 WL 4468331, at *2, and James has not given any reason why his own interests require him to do it for her, *cf. Durham*, 2017 WL 3222942, at *2; the only case James cites, *Madu*, 265 F.R.D. at 114-15, is to the contrary. As a number of the above-cited cases have explained, a defendant can decide to waive service, and it is improper for another defendant to make that decision for her. The Court denies James's motion to quash, without prejudice to Mrs. Park's right to make the same motion on her own behalf.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court denies the Park children's motion to dismiss [74] and James's motion to quash [88].  A status hearing is set for June 27, 2019 at 9:30 a.m.

**SO ORDERED.**                                          **ENTERED: May 24, 2019**

_____

**HON. JORGE L. ALONSO**
**United States District Judge**